PREET BHARARA
United States Attorney for
the Southern District of New York
By:   SHARON COHEN LEVIN
      MARTIN S. BELL
      Assistant United States Attorneys
      One St. Andrew's Plaza
      New York, New York 10007
      Tel. (212) 637-1060/2463

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA            :
                                    :
                                    :
            -v.-                    :       FIRST AMENDED
                                    :       VERIFIED COMPLAINT
                                    :
ONE TYRANNOSAURUS BATAAR SKELETON,  :       12 Civ. 4760
a/k/a LOT 49315 LISTED ON PAGE 92   :
OF THE HERITAGE AUCTIONS MAY 20,    :
2012 NATURAL HISTORY AUCTION        :
CATALOG;                            :
                                    :
            Defendant-in-rem.       :
                                    :
- - - - - - - - - - - - - - - - - - x

I.    INTRODUCTION . . . . . . . . . . . . . . . . 2

II.   JURISDICTION AND VENUE . . . . . . . . . . . 3

III.  PROBABLE CAUSE FOR FORFEITURE . . . . . . . . 3

      A.    The Bataar  . . . . . . . . . . . . . . 4

      B.    Mongolian Law . . . . . . . . . . . . . 4

            i.   Mongolian Constitution . . . . . . . . . . 5

            ii.  Mongolian Rules to Protect the Antiquities . . . 6

            iii. Mongolian Law on Cultural Heritage . . . . . . . 7

            iv.  Criminal Law of Mongolia . . . . . . . . . . 8

v.   Mongolian Court Decision . . . . . . . . . . . . 10

C.   The Defendant Property . . . . . . . . . . . . . 10

i.   The July 26, 2012 Meeting . . . . . . . . . 14

ii.  The September 5, 2012 Court Conference . . . . 17

iii. Additional Expert Reports . . . . . . . . . 17

E.   Other Seizures . . . . . . . . . . . . . . . . 20

i.   The Saurolophus Skeleton . . . . . . . . . 20

ii.  The Microraptor Skeleton . . . . . . . . . 23

F.   Eric Prokopi . . . . . . . . . . . . . . . . 24

IV. CLAIMS FOR FORFEITURE . . . . . . . . . . . . . . . 25

Plaintiff United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its first amended verified complaint alleges, upon information and belief, as follows:

## I.   INTRODUCTION

1.   On or about June 18, 2012, this action was commenced by the filing of an *in rem* civil forfeiture complaint (the "Complaint"). The Complaint sought the civil forfeiture of one Tyrannosaurus bataar skeleton, a/k/a lot 49315 listed on page 92 of the Heritage Auctions May 20, 2012 Natural History Auction Catalog (the "Defendant Property") for its return to the Government of Mongolia. A photograph of the Bataar Skeleton is attached hereto as Exhibit A.

## II.   <u>JURISDICTION AND VENUE</u>

2.    This action is brought by the United States of America pursuant to Title 18, United States Code, Sections 545 and 981(a)(1)(C) and Title 19, United States Code, Section 1595a(c) seeking the forfeiture of the Defendant Property.

3.    This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

4.    Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred within the Southern District of New York.

5.    The Defendant Property is presently in the custody of Immigration and Customs Enforcement/Homeland Security Investigations ("ICE/HSI"), Department of Homeland Security.

## III.   <u>PROBABLE CAUSE FOR FORFEITURE</u>

6.    The Gobi Desert, namely the Nemegt Formation within the Gobi Desert, which is located in Mongolia, is a fertile fossil field of dinosaur relics, including those of the Tyrannosaurus (Tarbosaurus) bataar (the "Bataar").

7.    Fossilized dinosaur bones found with the Nemegt Formation have a distinctive color to them as a result of the soil composition of Nemegt Formation.

### A.   The Bataar

8.   The Bataar, a native of Mongolia, is a dinosaur from the late Cretaceous period, approximately 70 million years ago.  Bataar fossils were first discovered in 1946, during a joint Soviet-Mongolian expedition to the Gobi Desert in the Mongolian Ömnögovi Province.

9.   Since the Soviet-Mongolian Gobi Desert expeditions in the 1940s there have been several additional expeditions, all of which have recovered Bataar fossils from the Gobi Desert.

10.   Entire Bataar fossils have only been recovered from a small area in the Gobi Desert known as the Nemegt Basin located in Mongolia.  Small fractional pieces of Bataar fossils have been located in neighboring countries.

11.   Due to the specific soil composition of the Nemegt Formation, Bataar fossils uncovered from that Formation have a particularized coloring.

### B.   Mongolian Law

12.   Since as early as 1924, when Mongolia became an independent nation, the Government of Mongolia has prohibited the personal or non-state ownership of items of cultural significance, such dinosaur remains, such as the Defendant Property.

13.   Mongolia became a signatory to the United Nations Educational, Scientific and Cultural Organization, Convention on

the Means of Prohibiting and Preventing the Illicit Import,

Export and Transfer of Ownership of Cultural Property on May 23,

1991.

### i. Mongolian Constitution

14. Article Three, Section One of the People's

Republic of Mongolia Constitution of 1924, specifically states

> [b]ecause/since all lands and resources
> within their subsoil, forests, water and the
> natural resources within them, as well as the
> culture and characteristics of Mongolia which
> have been in possession of the people since
> ancient times do meet the customs of the
> present state and its people, all assets and
> resources mentioned above shall be under the
> possession of the people, thus making private
> property of them prohibited.

15. In 1940, the Mongolia government enacted the 1940

People's Republic of Mongolia Constitution.  Article 5 of the

1940 People's Republic of Mongolia Constitution restated the same

principle contained within Article 3, Section 1 of the 1924

People's Republic of Mongolia Constitution, that being "all lands

and resources within them and their subsoil . . . and the

resources within them . . . are the property of the state, in

other words, the asset of the people."

16. Article 10 of the 1960 People's Republic of

Mongolia Constitution, once again restated the same principles

contained within Article 3, Section 1 of the 1924 Constitution

and Article 5 of the 1940 Constitution, again that being that

"all lands and resources within them and their subsoil . . . and

the resources within them . . . are the property of the state, in other words, the asset of the people."

17.   More recently, in 1992, the Mongolian Government enacted the current Constitution of Mongolia which again provides that dinosaur fossils are property of the Government of Mongolia. Specifically, Article 7 of the current Constitution of Mongolia provides that "Historical, cultural, scientific and intellectual heritages of the Mongolian People shall be under State protection."

### ii.   Mongolian Rules to Protect the Antiquities

18.   Since at least 1924, Mongolian Law has characterized dinosaur fossils as property of the Government of Mongolia.

19.   Article One of the 1924 Mongolian Rules to Protect the Antiquities states that "all antique items and relics of the past found within the territory of Mongolia shall be owned by Mongolia."  "Antiques and relics" are further defined in Article Two, Section Five of the 1924 Mongolian Rules to Protect the Antiquities as "[p]aleonthological items such as remnants of ancient plants and animals as well as archeological findings that ought to be preserved in museums."

20.   Article 9 of the 1924 Mongolian Rules to Protect the Antiquities further provides "one-of-the-kind rare items are prohibited to be transported abroad."  A violation of Article 9

is punishable by a criminal penalty pursuant to Article 11 of 1924 Mongolian Rules to Protect the Antiquities.

### iii.   Mongolian Law on Cultural Heritage

21.   Pursuant to Article 3.1.8 of the Mongolian Law on Cultural Heritage fossils and animal imprints are defined as "historical and cultural valuable objects."

22.   Article 13.1 of the 2001 Mongolian Law on Cultural Heritage specifically provides that "[t]he territory and land bowels where historically, culturally and scientifically significant objects exist shall be under state protection and any such findings shall be a state property."

23.   Furthermore, Article 13.2 of the Law on Cultural Heritage provides that any discoveries of culturally and scientifically significant objects must be registered with the local and national governments of Mongolia within one year of their discovery.

24.   In addition, Article 16.3 of the Law on Cultural Heritage provides that "[i]t is prohibited to transfer the ownership rights of the exclusively valuable historical and cultural valuable object to foreign citizen or stateless person through selling, presenting and inheriting.

25.   Lastly, Article 20.4 of the Law on Cultural Heritage mandates that in situations where "historical and cultural[ly] valuable objects are illegally sent abroad [outside

of Mongolia] or the object allowed to . . . cross[] the national
[Mongolian] border" the Government of Mongolia must take all
steps necessary to ensure the return of the object to Mongolia.

### iv.   Criminal Law of Mongolia

26.   Mongolian Law has further protected the Mongolian
Government's ownership interest in dinosaur fossils since as
early as 1924 by criminalizing the illegal smuggling of such
objects out of Mongolia.

27.   In 1926, Chapter 15, Article 114 of the Criminal
Law of the People's Republic of Mongolia was enacted.  That
Article provides that "[v]iolators of rules to guard and protect
antiquities and relics preserved since ancient times and/or
representing them, shall be sentenced up to one year in jail."

28.   Furthermore, in 1929, the Mongolian Government
enacted two laws which provided specific penalties for violations
of restrictions on state owned property.  More specifically,
Chapter 2, Article 63 of the Criminal Law of the People's
Republic of Mongolia provides "[t]hieving, embezzling, and
misappropriating in any other forms of state and public property
shall be sentenced up to seven years in prison."  Additionally,
Chapter 14, Article 118 of the Criminal Law of the People's
Republic of Mongolia provides that "[v]iolators of rules to guard
and protect antiquities preserved since ancient times . . . shall
be sentenced to pay up to 600 tugrugs."

29.  In 1986, the Government of Mongolia again enacted criminal laws that established penalties for the illegal export of dinosaur fossils.  Specifically, Article 172.2 of the Criminal Code of Mongolia provided that "illegal transportation of . . . rare ancient animals, plants, valuable items of the museum, historically and archeologically significant items, through the Mongolian border shall be penalized by confiscation of the items, and imprisonment of up to five years in prison or be fined the amount between 100,000 tugrugs and 500,000 tugrugs."

30.  Recently, in 2008, the Mongolia Government amended Article 175 of the Criminal Code of Mongolia to read that

> illegal transportation through the state
> border restricted goods, rare animals, . . .
> minerals and natural elements shall be
> punishable by either confiscation of property
> or a fine equal to 51 to 150 times the amount
> of minimum salary or 251 to 500 hours of
> forced labor or incarceration for a term of 3
> to 6 months.

31.  Article 175.2 of the 2002 Criminal Code of the Law of Mongolia, which specifies the criminal penalty imposed for violations of the anti-smuggling laws, provides that:

> in case historical or cultural valuable
> objects, museum exhibits, unique, rare and
> valuable findings of ancient animals and
> plants, archeological and paleontological
> findings and artifacts are smuggled through
> the national border, the assets shall be
> seized and the [persons] shall be imposed a
> fine . . . or imprisoned for two to five
> years.

### v.   __Mongolian Court Decision__

32.   The Mongolian Supreme Court issued an interpretation decree, number 24,2003, stating that the smuggling of any properties listed in the Law on Cultural Heritage shall be a crime regardless of the number, size and monetary value of the item.

### D.   __The Defendant Property__

33.   On May 20, 2012, the Defendant Property was offered for sale in New York City at an auction (the "Heritage Auction") conducted by Texas based Heritage Auctions, Inc. ("Heritage").

34.   The Defendant Property was consigned to Heritage by Eric Prokopi ("Prokopi"), the former owner of Florida Fossils and current owner of Everything-Earth.com.  On Prokopi's current business website, Everything-Earth.com, his occupation is listed as a "Commercial Palaeontologist."

35.   On or about May 22, 2012, ICE/HSI served Heritage with a Department of Homeland Security Summons to Appear and/or Produce Records (the "Customs Summons") relating to

> Any and all records relating to Lot 49315m "SUPERB TYRANNOSAURUS SKELETON", offered during the 2012 May 20 Natural History & Fine Minerals Signature Auction – New York #6068. To include customs entry, detailed provenance, name of the owner, seller, consignor, shipper, importer, exporter, _all international and domestic shipping records_, name and location of purchaser.

(Emphasis added).

10

36.   On or about May 23, 2012, in response to the Customs Summons, counsel for Heritage sent ICE/HSI several documents which it identified as responsive to the Customs Summons (the "Bataar Documentation").   Heritage further stated that "[i]f any other responsive documents are discovered they [the documents] will immediately be sent."   To date, ICE/HSI has not received any further responsive documents from Heritage.   The Bataar Documentation, which is attached hereto as Exhibit B, is comprised of the following documents:

(a)   a one-page U.S. Department of Homeland Security ("DHS"), Bureau of Customs and Border Protection ("CBP"), Entry/Immediate Delivery form (the "CBP Entry Form");

(b)   a one-page DHS, CBP, Customs Bond Form;

(c)   a one-page commercial invoice from Chris Moore Fossils to Eric Prokopi ("Commercial Invoice");

(d)   a one-page UPS Air Waybill; and

(e)   a two-page UPS Supply Chain Solutions Invoice.

37.   According to the CBP Entry Form, the Defendant Property was imported from Great Britain to Gainesville, Florida on or about March 27, 2010.   Florida Fossils is listed on the Customs Entry Form as the ultimate consignee.   At the time, Florida Fossils was owned by Prokopi.

11

38.   The CBP Entry Form for the Defendant Property contains several misstatements.  First, the country of origin for the Defendant Property is erroneously listed as Great Britain rather than Mongolia.  Second, the Defendant Property is substantially undervalued.  The CBP Entry Form lists the value of the Defendant Property as $15,000 contrary to the $950,000 – $1,500,000 value listed in the Heritage Auctions May 20, 2012 Natural History Auction catalog and the actual auction sale price of $1,052,500.  Third, the Defendant Property is incorrectly described in the Commercial Invoice as "2 large rough (unprepared) fossil reptile heads;" "6 boxes of broken fossil bones;" "3 rough (unprepared) fossil reptiles;" "1 fossil lizard;" "3 rough (unprepared) fossil reptiles;" and "1 fossil reptile skull."

39.   After arriving in Florida from Great Britain the Defendant Property was transported to Texas then eventually transported to New York where it is currently located.

40.   Prior to the Heritage Auction, Elbegdorj Tsakhia, the President of Mongolia ("President Elbegdorj"), obtained a Temporary Restraining Order (the "Order") from Texas State Civil District Judge Carlos R. Cortez prohibiting Heritage and its agents from auctioning, selling, releasing or transferring the Defendant Property.  Notwithstanding the entry of the state court order, Heritage completed the auction and the Defendant Property

was sold for $1,052,500 contingent upon the outcome of any court proceedings on behalf of the Government of Mongolia.

41.   The Defendant Property, which was listed as lot number 49315 in the Heritage Auction catalog is described as

> SUPERB TYRANNOSAURUS SKELETON
> T.bataar . . . ruled the food chain of the ancient floodplains that are today's Gobi Desert . . . This is an incredible, complete skeleton, painstakingly excavated and prepared . . . The body is 75% complete and the skull 80% . . . Measuring 24 feet in length and standing 8 feet high, it is a stupendous, museum-quality specimen of one of the most emblematic dinosaurs ever to have stalked this Earth.

42.   The Defendant Property was examined on June 5, 2012 at the request of the President Elbegdorj by several palaeontologists specializing in Bataars.  Among those examining the Defendant Property was Dr. Bolortsetseg Minjin, PhD, Institute for the Study of Mongolian Dinosaurs, New York Representative of the Mongolian Academy of Sciences ("Dr. Minjin"); Dr. Philip J. Currie, Msc, PhD, FRSC, Professor and Canada Research Chair of Dinosaur Paleobiology at the University of Alberta, and President of the Society of Vertebrate Paleontology ("Dr. Currie"); and Dr. Khishigjav Tsogtbaatar, PhD, Head of Paleontological Laboratory and Museum, Research Center of Paleontology, Mongolian Academy of Sciences, Mongolia ("Dr. Tsogtbaatar").  All examining paleontologists concluded that the Defendant Property is a Tyrannosaurus bataar (also known as

Tarbosaurus baatar).  All the Palaeontologists agree that Bataars are native to Mongolia and all concluded that the Defendant Property almost certainly came from the Nemegt Basin in Mongolia. Attached as Exhibit C are reports from several of the examining paleontologists.

43.   Specifically, Dr. Minjin concluded that the Defendant Property "was collected from Mongolia, probably in the Nemegt Basin."  Dr. Currie concluded that "Tarbosaurus bataar skeletons have only ever been recovered from the Nemegt basin and adjacent regions in Mongolia, which . . . indicates that . . . [the Defendant Property] was collected in Mongolia."  Moreover, Dr. Tsogtbaatar concluded that "[t]he general appearance of the . . . [Defendant Property] and the color of the bones indicate to us that this is the skull and skeleton of a Tarbosaurus bataar (also known as Tyrannosaurus bataar) from the Nemegt Formation of Mongolia."

44.   Additionally, Dr. Tsogtbaatar has stated that the Defendant Property "was unearthed [between] the period 1995-2005 from the Western Gobi Desert in Mongolia."

i.   **The July 26, 2012 Meeting**

45.   On July 26, 2012, the Government met with counsel for Prokopi to discuss the Defendant Property and the recently filed civil forfeiture complaint (the "July 26, 2012 Meeting").

46.   At the July 26, 2012 Meeting Counsel for Prokopi advised the Government that the description of the Defendant Property as contained within the Verified Complaint was incomplete.   Counsel for Prokopi claimed that the Defendant Property was transported into the United States in *three* separate shipments and not just a single shipment as alleged in the Verified Complaint.

47.   After the July 26, 2012 Meeting, on or about August 2, 2012, the Government received a letter from counsel for Prokopi, a copy of which is attached hereto as Exhibit D, which once again claimed that the Defendant Property was imported in three separate shipments (the "August 2, 2012 Letter").

48.   Specifically, the August 2, 2012 Letter stated that "the March 2010 import shipment cited in paragraph 17 of the Complaint included only a small portion of the Tyrannosaurus bataar display piece . . . the March 2010 shipment included . . . the head [of the Defendant Property which] was incorporated into the" Defendant Property.

49.   The August 2, 2012 Letter also stated "Mr. Prokopi imported two other shipments of various fossils on March 22, 2007 and August 29, 2007, and to the best of his recollection part of one or both of these shipments was incorporated into the" Defendant Property.

15

50. Copies of the importation paperwork for the March 22, 2007 and August 29, 2007 shipments (the "Prokopi Importation Documents") were attached to the August 2, 2012 Letter.

51. The importation paperwork for the March 22, 2007 shipment lists the items being imported as "fossil specimens" with a declared value of $12,000. On the CBP Entry Form for this shipment, the Country of Origin is listed as Japan.

52. In the documents provided by Prokopi's counsel, the UPS Air Waybill for the March 22, 2007 shipment, states that the Country of Origin for the shipment is Mongolia. However, included in the Prokopi Importation Documents is an "Additional Information" form which states that on March 29, 2007 UPS obtained information from Prokopi that the country of origin for the March 22, 2007 shipment is Japan.

53. According to CBP records for the March 22, 2007 shipment, the country of origin on the Commercial Invoice submitted to CBP was changed from Mongolia to Japan. Specifically, the Commercial Invoice has a handwritten notation stating "IOR is Correct per Eric Prokopi XXX-XXX-XXXX c/o per above." The CBP records for the March 22, 2007 shipment are attached hereto as Exhibit E.

54. The importation paperwork for the August 29, 2007 shipment listed the items being imported as "fossils" with a

declared value of $42,000. On the CBP Entry Form for this shipment, the Country of Origin is listed as Japan.

55. Regardless whether the Defendant Property came from one or more shipments the importation documents provided by Prokopi contain material misrepresentations.

### ii.   The September 5, 2012 Court Conference

56. On September 5, 2012, the Honorable P. Kevin Castel, United States District Judge, Southern District of New York, held a Conference which was attended by counsel for the Government and counsel for Prokopi, the same counsel that met with the Government at the July 26, 2012 Meeting (the "Court Conference").

57. At the Court Conference, counsel for Prokopi advised the Court that the Defendant Property was comprised of fossilized material from *four* international shipments as well as material purchased domestically.  However, the specifics of those shipments were not disclosed except that it was believed some of the international shipments came from Japan.

### iii.   Additional Expert Reports

58. Since the Court Conference, the Government has received five reports from the following paleontologists addressing whether the Defendant Property could have come from China or Kazakstan rather than Mongolia: Dr. Currie, Dr. Norell, Dr. Minjin, Dr. J. David Archibald, Ph.D., Professor Emeritus of

Biology and Curator of Mammals ("Dr. Archibald"), Dr. Pascal Godefroit, Senior Scientist, Institut royal des Sciences naturelles de Belgique, Department of Palaeontology ("Dr. Godefroit"), Dr. Zhonghe Zhou, Director, Institute of Vertebrate Paleontology and Paleonanthropology, Chinese Academy of Sciences ("Dr. Zhou"), and Gareth Dyke, Senior Lecturer, Vertebrate Palaeontology, Ocean and Earth Science, National Oceanography Centre, Southampton, University of Southampton (collectively, the "Opining Paleontologists").  The reports and Curriculum Vitaes of the Opining Paleontologists are attached hereto as Exhibit F.

59.  The Opining Palaeontologists agree that due to the coloring of the bones the Defendant Property came from Mongolia, more specifically, the Nemegt Formation.

60.  More specifically, Doctors Currie, Norell, and Minjin state

> We have already noted that the bones from the Nemegt Formation have an appearance and signature coloration that makes them easy to distinguish visually from fossils from equivalent age in neighboring countries (China, Kazakhstan, Russia) . . . We . . . are highly confident that the specimen is composed, for the most part, of a single skeleton of Tarbosaurus, although it is quite possible that parts of other Tarbosaurus skeletons were used to make the specimen more commercially attractive.  Whether a single skeleton or multiple skeletons were used to construct this specimen, we are virtually certain that all of the bones were excavated in Mongolia.

61.   Doctors Currie, Norell, and Minjin also state that

> it is unlikely that the major part of the . .
> . [Defendant Property] is formed from more
> than one individual because the specimen is
> 60% grown, and of the known specimens of
> Tarbosaurus bataar, specimens in the 55 to
> 65% range of growth make up only 13% of the
> specimens recovered . . . The probability of
> Erik (sic) Prokopi being able to obtain three
> or four individuals of the exact same size is
> extremely low.

62.   Furthermore, with respect to the assertion that

the Defendant Property or component parts of the Defendant

Property may have come from Russia or Kazakhstan, Dr. Godefroit

states

> I have examined photographs of the seized
> Tarbosaurus and I am sure that this specimen
> was not discovered in Russia or Kazakhstan .
> . . Furthermore, there are significant
> differences in the mineralization and
> coloration of the dinosaur bones discovered
> in . . . [Russia or Kazakhstan], which allows
> us to be substantially sure that the seized
> Tarbosaurus was discovered in the Nemegt
> Formation of the Gobi Desert, and not in
> Russia or Kazakhstan.

63.   Relatedly, Dr. Archibald states

> based on photos I have seen, the physical
> color of . . . [the Defendant Property] is
> inconsistent with fossilized dinosaur bones
> that have been found in Kazakhstan or
> elsewhere in the countries I have worked.
> Further, it is my opinion, because of the
> size of the component bones and their
> coloration, it is not possible that any part
> of this specimen originated in Kazakhstan.

64.   Finally, with respect to the notion that pieces of the Defendant Property may have come from China, Dr. Zhou states

> all known large Tyrannosaurus specimens from China are different from those from Mongolia in bone color.  The bone color of the . . . [Bataar Skeleton], and all of its component parts, match the characteristic Mongolian bone color.  In conclusion, it is my professional opinion, and that of my Chinese colleagues, that . . . [Bataar Skeleton], including all of its component parts/bones, were collected in Mongolia, rather than China.

65.   Several of these experts agree that based on its coloring, which reflects the distinct mineralization of the Nemegt Formation of Mongolia, the Defendant Property is clearly from Mongolia.

### E.   Other Seizures

#### i.   The Saurolophus Skeleton

66.   The Saurolophus genus of dinosaurs has been found in both North America and Asia.  However, according to Dr. Mark A. Norell, the angustirostris species (the "Angustirostris") has only been found in Mongolia, specifically the Nemegt Formation within the Gobi Desert of Mongolia.

67.   The Angustirostris, a native of Mongolia, is a species of dinosaur from the late Cretaceous period, approximately 68 million years ago.

68.  Angustirostris fossils have only been recovered from a small area in the Gobi Desert known as the Nemegt Basin which is located in Mongolia.

69.  Due to the specific soil composition of the Nemegt Formation, Angustirostris fossils uncovered from that Formation have a particularized coloring.

70.  On September 20, 2012, Magistrate Judge Gabriel W. Gorenstein, Southern District of New York issued a seizure warrant for one Saurolophus Angustirostris Skeleton (the "Saurolophus Skeleton"), which was listed as lot number 218 in the Chait Gallery NH1205 May 6, 2012 internet sale on www.chait.com (the "Chait May 6, 2012 Sale") finding probable cause to believe that the Saurolophus Skeleton is subject to seizure and civil forfeiture pursuant to Title 18, United States Code, Sections 545 and 981(a)(1)(C) and Title 19, United States Code, Section 1595a(c).

71.  The Saurolophus Skeleton, is described on the I. M. Chait auction website, www.chait.com, as:

> SUPERB CRESTED HADROSAUR SKELETON
> Saurolophus angustirostris
> Late Cretaceous
> Central Asia
> . . . the Asian species represented here was the largest known at nearly 40 feet long, making it as large as a modern bus.

Attached hereto as Exhibit G is a printout of the internet sales listing dated July 9, 2012, for the Saurolophus Skeleton.

72.  On or about, July 3, 2012, at the request of the Government, Dr. Mark A. Norell, Chairman and Curator of the Division of Paleontology of the American Museum of Natural History viewed the Chait May 6, 2012 Sale listing for the Saurolophus Skeleton on the Chait Gallery website, www.chait.com. Dr. Norell has concluded that the Saurolophus Skeleton is "a very well preserved skeleton of Saurolophus angustirostris." Dr. Norell has also stated that the Saurolophus angustirostris "is only known from the Late Cretaceous (about 68 million years ago) Nemegt Formation of southern Mongolia." Attached hereto as Exhibit H is a copy of a letter from Dr. Norell dated July 3, 2012 regarding the Saurolophus Skeleton.

73.  In or about February, 2012, Chait Gallery purchased a fifty percent (50%) ownership interest in the Saurolophus Skeleton from Prokopi. In consideration for said sale, Chait Gallery paid Prokopi $50,000 in two installments, one in the amount of $45,000 on or about February 13, 2012 and one in the amount of $5,000 on or about April 11, 2012. At the time of the purchase, the Saurolophus Skeleton was located in Florida and subsequently shipped by Prokopi to Chait Gallery in California on or about April 24, 2012.

74.  On or about April 5, 2012, Prokopi sent Chait Gallery an email describing the Saurolophus Skeleton as "species

. . . Saurolophus angustirostris, late cretaceous, nemegt formation, Mongolia."

75.   On or about May 30, 2012, after the Saurolophus Skeleton failed to sell at the Chait May 6, 2012 Sale, Chait Gallery purchased the remaining fifty percent (50%) interest in the Saurolophus Skeleton from Prokopi for approximately $25,000.

### ii. **The Microraptor Skeleton**

76.   On or about May 21, 2010, Prokopi attempted to import a Microraptor or Fossil Reptile Skeleton in Matrix (the "Microraptor") into the United States[1].   However, rather than being described as "Microraptor" or "Fossil Reptile Skeleton in Matrix" the Microraptor was initially described as "sample of craft rock" on the invoice but then at some point a pen and ink change (the "Pen and Ink Change") was made to the description on said invoice so that it read that the Fossil was a "fossil replica."

77.   According to UPS records, The Pen and Ink Change was made on April 21, 2010 and made because "Eric Prokopi called and said contents were a replica fossil mounted in rock with a value of $100.00 USD."

78.   As a result of the material misrepresentations made on the customs import documents, the Microraptor was seized

---

[1]     For this shipment Prokopi used United Parcel Service, Inc. ("UPS") as their customs broker.

on or about May 21, 2010 by the United States' Department of Homeland Security ("DHS").

79.   Shortly thereafter, administrative forfeiture proceedings were commenced by DHS and on or about May 25, 2010, Prokopi was provided with notice of said administrative forfeiture proceedings.

80.   On or about June 1, 2010, Prokopi responded by sending CBP a letter stating that he had "$1,000 invested in this item" referring to the Microraptor.  Contrary to not only the initial declared value of $30 and the amended declared value of $100.00.

81.   On or about October 12, 2010, pursuant to Title 19, United States Code, Sections 1499 and 1595a(c), DHS administratively forfeited the Microraptor.

### F.   Eric Prokopi

82.   Prokopi's occupation on his current business website, Everything-Earth.com, is listed as "commercial palaeontologist."

83.   The Mongolian Government has advised that Prokopi visited Mongolian in 2008, 2009, 2011 and most recently in 2012, after the filing of the instant forfeiture action.

84.   Specifically, the Mongolian Government has advised the United States that it has located a witness in Mongolia who states that during Prokopi's 2009 visit he witnessed Prokopi

remove fossil bones from the ground in the Gobi Desert in Mongolia, specifically in the Nemegt Formation.

### IV.   CLAIMS FOR FORFEITURE

85.   Incorporated herein are the allegations contained in paragraphs one through eighty-four of this Complaint.

86.   Title 18, United States Code, Section 542 states, in pertinent part

> Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties . . . .

87.   Title 18, United States Code, Section 545 states, in pertinent part

> . . . Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law - -
>
> Shall be fined under this title or imprisoned not more than 20 years, or both . . . .

88.  Title 18, United States Code, Section 545, further provides that "[m]erchandise introduced into the United States in violation of this section . . . shall be forfeited to the United States."

89.  Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7))."

90.  Title 18, United States Code, Section 1956(c)(7)(A) defines "specified unlawful activity" as "any act or activity constituting an offense listed in section 1961(1) of this title."

91.  Included among the list of Specified Unlawful Activities listed in section 1961(1) is Title 18, United States Code, Section 2314, which relates to interstate transportation of stolen property and Section 2315, which relates to sale or receipt of stolen goods.

92.  Section 2314 of Title 18 of the United States Code, states in pertinent part

> Whoever transport, transmits, or transfers in
> interstate or foreign commerce any goods, wares,
> merchandise, securities or money, of the value of
> $5,000 or more, knowing the same to have been stolen,
> converted or taken by fraud . . . shall be fined under
> this title or imprisoned not more than ten years, or
> both . . . .

26

93.   Section 2315 of Title 18 of the United States Code, states in pertinent part

> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise . . . which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken . . . [s]hall be fined under this title or imprisoned not more than ten years, or both . . . .

94.   Pursuant to Title 19, United States Code, Section 1595a(c)(1)(A) "[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law shall be . . . seized and forfeited [to the United States] if it – is stolen, smuggled, or clandestinely imported or introduced."

95.   The Defendant Property is subject to forfeiture pursuant to Title 19, United States Code, 1595a(c) because there is probable cause to believe that the Defendant Property was stolen from Mongolia and introduced into the United States contrary to law, in that the Defendant Property was (1) introduced into the commerce of the United States by means of false statements and/or (2) transported in foreign commerce knowing it was stolen or converted.

96.   The Defendant Property is subject to forfeiture pursuant to Title 18, United States Code, Section 545 because there is probable cause to believe that the Defendant Property is merchandise which was introduced into the United States in

27

violation of that section, in that the Defendant Property was (1) introduced into the United States by means of false statements in violation of Title 18, United States Code, Section 542 and/or (2) imported into the United States knowing it was stolen or converted.

97.   The Defendant Property is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) because there is probable cause to believe that the Defendant Property is property, real or personal, which constitutes or is derived from a violation of Title 18, United States Code Section 2314 and/or Section 2315.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Property and that all persons having an interest in the Defendant Property be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Property to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       September 21, 2012

PREET BHARARA
United States Attorney for
the Southern District of New York
Attorney for the Plaintiff
United States of America

By: _____

SHARON COHEN LEVIN
MARTIN S. BELL
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-1060/2463

<u>VERIFICATION</u>

STATE OF NEW YORK                        )
COUNTY OF NEW YORK                  :
SOUTHERN DISTRICT OF NEW YORK  )

Daniel Brazier, being duly sworn, deposes and says that he is a Special Agent with Immigration and Customs Enforcement/Homeland Security Investigations, Department of Homeland Security, and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

The sources of deponent's information and the ground of his belief are conversations with other law enforcement officers and others, official records and files of Immigration and Customs Enforcement/Homeland Security Investigations, Department of Homeland Security, and the United States Government, and information obtained directly by deponent during an investigation of alleged violations of Title 18, United States Code, Sections 542, 545, 2314, and 2315 and Title 19, United States Code, Section 1595a.

DANIEL BRAZIER
Special Agent
Immigration and Customs Enforcement/
Homeland Security Investigations,
Department of Homeland Security

Sworn to before me this
21st day of September, 2012

NOTARY PUBLIC
Lisabeth A. Mendola-D'Andrea
Notary Public, State of New York
No: 01ME5079305
Qualified in Queens County
Commission Expires June 2, 2015